IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **SERGIO RODRIGUEZ** | : | No. 13-619-6 |

MEMORANDUM

**Schiller, J.**                                                                                                                    **September 8, 2014**

Sergio Rodriguez, charged with conspiracy to distribute cocaine under 21 U.S.C. § 841 and 21 U.S.C. § 846, moves to suppress evidence the police discovered when they searched his apartment pursuant to a warrant. The Court finds that the search violated the Fourth Amendment because there was not a substantial basis to believe that the affidavit supporting the warrant established probable cause to search Rodriguez's apartment. Furthermore, the Court concludes that the police did not act in good faith in relying on the search warrant. Therefore, the Court grants Rodriguez's motion to suppress.

**I.      BACKGROUND**

On October 11, 2013, Pennsylvania Bureau of Narcotics Investigation (BNI) agents searched Rodriguez's residence at 3300 Street Road, Apartment L1, in Bensalem, Pennsylvania. (Def. Rodriguez's Mem. of Law in Supp. of Mot. to Suppress Physical Evidence [Rodriguez Mem.] at 5.)  Agents recovered approximately $260,000 from Rodriguez's apartment. (Gov't's Mem. of Law in Resp. to Def. Rodriguez's Mot. to Suppress Physical Evidence [Gov't's Resp.] at 6.) The search was conducted pursuant to a warrant issued by a Bucks County District Justice,

based on an affidavit submitted by BNI Agents Michael Kelly and Nehemiah Haigler. (Rodriguez Mem. at 2.)

According to the affidavit, intercepted telephone conversations reflected a drug conspiracy among Jorge Martinez, Alfredo Alberto Almeida-Urias, Wallace Oliveira, and Luis Gonzalez. (Rodriguez Mot. to Suppress Physical Evidence, App. A, Aff. in Supp. of Probable Cause in Supp. of Search Warrants [Aff.] ¶¶ 39-40.) The affidavit does not implicate Rodriguez in these conversations. The affidavit further states that agents witnessed a brief meeting between Rodriguez, Almeida-Urias, and Martinez in the parking lot of a Philadelphia restaurant on September 6, 2013. (*Id.* ¶¶ 43-45.) Martinez and Almeida-Urias arrived in the parking lot in Martinez's car, and Rodriguez walked toward the car. (*Id.* ¶¶ 44-45.) After a brief conversation with Almeida-Urias, Rodriguez drove away in a gray Ford Fusion, which was registered under his name and address at 3300 Street Road, Apartment L1, in Bensalem, Pennsylvania. (*Id.* ¶ 45.) Agents followed Rodriguez to 3300 Street Road and observed him park outside of building L and enter building L using a key. (*Id.* ¶ 46.) The affiants did not claim to overhear the content of Rodriguez's conversation with Almeida-Urias or witness any transfer of property.

The affidavit states that on October 8, 2013, agents executed search warrants on properties and vehicles associated with Martinez, Oliveira, and Gonzalez. (*Id.* ¶ 47.) Agents recovered large quantities of drugs and cash, several guns, and drug paraphernalia. (*Id.* ¶¶ 48-54.) Later that day, agents arrested Almeida-Urias and Martinez. (*Id.* ¶¶ 56-57.) According to the affidavit, Martinez told agents that he and Almeida-Urias were distributing cocaine in Philadelphia. (*Id.* ¶ 58.)

The affidavit also states that BNI Agent Ivan Miranda used Martinez's cell phone to arrange a meeting on October 10, 2013, with the driver of a tractor trailer charged with

transporting drug money to Almeida-Urias. (*Id.* ¶¶ 59-60.) Juan Monroy and Juan Enrique Castro, riding in a Nissan Altima, appeared at the designated meeting spot. (*Id.* ¶¶ 61-62.) Monroy told Agent Miranda that he intended to pick up money owed to Almeida-Urias and give it to Castro. (*Id.* ¶ 63.) Castro claimed that he did not know Monroy, and did not admit to any involvement in the drug conspiracy. (*Id.* ¶ 64.) Castro said that he was staying at a hotel, but he did not know its name or address. (*Id.*) Castro also said that he did not have family in Philadelphia, but that his son's name was Sergio Rodriguez. (*Id.*) Castro had in his possession a key to the Ford Fusion registered to Rodriguez. (*Id.* ¶¶ 62, 65.) The Ford Fusion was parked near a diner where Monroy said he picked up Castro before going to the meeting spot arranged by Agent Miranda. (*Id.* ¶ 65.)

The affidavit further states that at approximately 5:00 p.m. on October 10, 2013, agents went to 3300 Street Road,[1] Apartment L1 in Bensalem, Pennsylvania, and knocked on the front door. (*Id.* ¶ 66.) Rodriguez answered the door and allowed the agents to enter the apartment. (*Id.*) When an agent asked Rodriguez for consent to search the apartment, Rodriguez requested that the agents get a search warrant. (*Id.*) According to the affidavit, Rodriguez appeared "extremely nervous." (*Id.*)

The affiants stated that they believed, "based on their training and experience that, due to the large quantities and currency that the Almeida-Urias Drug Trafficking Organization is dealing with, it is likely that the evidence sought will be found within the described location." (*Id.* ¶ 71.) The affiants further stated that they believed "because of the large quantities of currency involved . . . the participants in the organization likely store the proceeds from the illegal sales for longer periods of time than a typical street level organization." (*Id.* ¶¶ 71.)

---

[1] The affidavit at times lists the location to be searched as "3300 State Road." Based on the Defendant's memorandum, the Court will refer to Rodriguez's address as "3300 Street Road." (Rodriguez Mem. at 14.)

Finally, the affiants stated that "it is common for drug organizations to utilize different locations to store monies gained from the sale of narcotics." (*Id.* ¶ 72.)

The affidavit further stated, "Your Affiant believes that the evidence located in 3300 Street Road, Bensalem, Pennsylvania could be relocated and/or destroyed at any time. Your Affiant believes that large amounts of money are being stored at the location, and through this investigation Your Affiant has learned the money is shipped to suppliers on a regular bases [sic] and does not accumulate due to the fear of being seized by law enforcement." (Aff. ¶ 78.) While the affiants stated that they believed that Castro, Monroy, Gonzalez, Oliveira, and Martinez were involved in distributing cocaine or money laundering, the affiants did not state that they believed that Rodriguez was involved in drug activity. (Aff. ¶ 76.)

## II.   STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Ordinarily, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010). Probable cause exists when, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The defendant bears the burden of establishing that his Fourth Amendment rights were violated. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). In making this determination, the Court must consider whether the judge who issued the warrant had a "substantial basis" to find probable cause. *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 238). The Court may consider only "the facts that were before

the magistrate, *i.e.*, the affidavit, and [may] not consider information from other portions of the record." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993)). While the magistrate's probable cause determination deserves "great deference," the Court may not merely "rubber stamp a magistrate's conclusions." *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002).

### III. DISCUSSION

#### A. The Issuing Magistrate Lacked a Substantial Basis to Conclude That Probable Cause Existed to Search Rodriguez's Home.

The Government argues that it is reasonable to infer that a drug dealer would store evidence of drug dealing in his home. *See United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002); *United States v. Hodge*, 246 F.3d 301, 306 (3d Cir. 2001). It is true that "a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there." *Stearn*, 597 F.3d at 558. However, the Third Circuit concluded in *Burton* that circumstantial evidence and inferences of this nature may establish probable cause to search a residence only if the evidence supports three preliminary premises: (1) the suspected person was actually a drug dealer; (2) the place to be searched was possessed by, or the domicile of, the dealer; and (3) that place contains contraband linking it to the dealer's drug activity. *Burton*, 288 F.3d at 104. The Third Circuit has concluded that "some evidence" of each premise is required. *Stearn*, 597 F.3d at 566.

The Court finds that the evidence of Rodriguez's involvement in the drug trafficking conspiracy, as recited in the affidavit, is insufficient to demonstrate that Rodriguez was a drug dealer. The affidavit states that Rodriguez met with Almeida-Urias and Martinez in a parking lot, prior to their arrests on drug charges. In addition, the affidavit provided facts suggesting that

5

Castro, who claimed to be Rodriguez's father, intended to transport drug proceeds using Rodriguez's car. Although evidence of association with drug dealers is relevant as to whether a suspect is himself a drug dealer, the probative value of such evidence is low. *See Stearn*, 597 F.3d at 566; *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"). Rodriguez's meeting with Almeida-Urias and Martinez is especially lacking in probative value because agents did not hear the content of their conversation or see any property being transferred. *See Sibron v. New York*, 392 U.S. 40, 62 (1968) (holding that an officer did not have probable cause to search a man on the grounds that he spent eight hours talking to known drug addicts, and emphasizing that the officer did not know the content of the conversations and saw nothing pass between the suspect and the addicts). The only other evidence against Rodriguez is that he was "extremely nervous" when agents visited his home. This, however, is unsurprising, given that most individuals would become nervous or agitated when law enforcement officers knock on their front doors. *See United States v. Ten Thousand Seven Hundred Dollars and No Cents in U.S. Currency*, 258 F.3d 215, 226 (3d Cir. 2001).

The Third Circuit's analyses in *Stearn* and *Hodge* are instructive. In *Stearn*, in considering whether probable cause existed to search the defendant's residence, the court deemed it "a close question . . . whether the affidavit contained adequate evidence to support *Burton*'s first 'preliminary premise'—that Stearn was a drug dealer—to raise the inference that drugs would be stored at his home." *Stearn*, 597 F.3d at 565. The evidence that Stearn was a drug dealer was far stronger than the evidence that Rodriguez was a drug dealer. First, a confidential informant had notified police that Stearn was a drug dealer. *Id.* The following additional evidence corroborated that tip: Stearn's three previous arrests for drug distribution; his

"conspicuous association" with a known drug dealer; and evidence that his residence was part of a network of suspiciously titled homes and cars, each connected to at least one of his co-defendants. *Id*. at 566. Similarly, in *Hodge*, the Third Circuit concluded that an informant's tip, corroborated when police witnessed the defendant engage in a prearranged drug sale while carrying a large amount of crack cocaine in his pants, suggested that the defendant was "an experienced and repeat drug dealer" who would likely store evidence of drug activity in his home. 246 F.3d at 306. While this affidavit "presented a close call," the court ruled that it was sufficient to support a magistrate judge's finding of probable cause. *Id.* at 309. In contrast, the only evidence of drug dealing by Rodriguez is his minimal association with drug dealers, one of whom was apparently his father, and Rodriguez's nervousness. The affidavit contains no evidence that an informant identified Rodriguez as a drug dealer, or that he was implicated in any of the wiretapped phone conversations. Likewise, there is no evidence that Rodriguez possessed drugs or drug proceeds during his brief encounter with Almeida-Urias and Martinez, or at any other time. Therefore, the Court finds that the affidavit did not contain adequate evidence that Rodriguez was a drug dealer.

The Court thus holds that the Bucks County District Justice lacked a substantial basis to find probable cause to issue a search warrant for Rodriguez's apartment.

### B. The Deficient Search Warrant is Not Saved By the "Good Faith" Exception Because the Officers' Reliance Was Objectively Unreasonable.

In its Supplemental Brief, the Government argues that the exclusionary rule does not apply because the agents relied in good faith on the warrant. (Gov't's Supplemental Brief at 6.) However, the Court finds that the good faith exception does not apply here.

Even if the magistrate judge lacked a substantial basis to make a probable cause determination, the evidence should not be suppressed if the officer who executed the warrant

7

acted with the "objectively reasonable belief" that his or her conduct did not violate the Fourth Amendment. *Stearn*, 597 F.3d at 560-61 (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The Government bears the burden of establishing the "good faith exception" to the exclusionary rule. *Leon*, 468 U.S. at 924. A warrant issued by a magistrate "normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* at 922. However, suppression is appropriate when "the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Stearn*, 597 F.3d at 561 n.19 (quoting *United States v. Williams*, 3 F.3d 69, 74 n.4 (3d Cir. 1993)). The Third Circuit has suggested that the good faith exception does not apply to affidavits which contain "mere conclusory assertions" or "a single piece of evidence which the law of the stationhouse shop would recognize as clearly insufficient." *Williams*, 3 F.3d at 74. Likewise, "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *Zimmerman*, 277 F.3d at 438.

Here, the facts in the affidavit supporting the search warrant are slim: (1) Rodriguez was observed meeting once with individuals known to be involved in drug activity; (2) Castro, who identified himself as Rodriguez's father, was carrying a key to Rodriguez's car during a meeting set up to collect drug proceeds; (3) Rodriguez's car was located near Rodriguez's apartment, in the diner parking lot where Munroy claimed to have picked up Castro; and (4) Rodriguez appeared to be extremely nervous during a visit by agents to his home. This evidence leads the affiants to the conclusory assertion that drug proceeds were likely to be found in Rodriguez's apartment. Unfortunately for the Government, the logical connection between the evidence presented in the warrant application and probable cause to search Rodriguez's apartment is extremely attenuated and speculative. The affidavit contains no observations or allegations

related to any drug-related activity at the apartment—indeed, the affidavit lacks sufficient evidence that Rodriguez was a drug dealer at all. Furthermore, while Castro possessed a key to Rodriguez's *car*, the affidavit fails to link Castro to Rodriguez's *apartment* or to present any evidence that Castro specifically intended to transport drugs or drug proceeds to or from the apartment.[2] Without "linchpin allegations" in the affidavit linking Rodriguez's apartment to the drug conspiracy, there could be no objectively reasonable belief in the existence of probable cause. *See Virgin Islands v. John*, 654 F.3d 412, 422 (3d Cir. 2011).

Prior cases in the Third Circuit involving home searches of alleged drug traffickers have required a more significant connection between the residences and drug activity to uphold warrants under the good faith exception. In *Stearn*, the Third Circuit upheld several search warrants for homes connected to a Philadelphia narcotics operation under the good faith exception. 597 F.3d at 563-70. The affidavits included tips from credible informants and observations of the defendants entering and exiting the residences with large bags. *Id.* Similarly, in *Hodge*, the officers based their affidavit on the defendant's arrest for possession of cocaine at a transaction with a known drug user. 246 F.3d at 305. While the Third Circuit upheld the search of the defendant's home based on probable cause, the court noted that it would have been objectively reasonable for the officers to rely on the magistrate's determination. *Id.* at 309. No such evidence is present in this case. Rodriguez was never implicated by an informant's tip or by wiretap intercepts. Neither Rodriguez nor Castro was observed entering or exiting Rodriguez's apartment while carrying suspected contraband. Likewise, neither man was observed transporting drugs or drug proceeds in the Ford Fusion. Finally, Rodriguez was never found or

---

[2] It was later discovered that Castro was an occasional overnight guest at Rodriguez's apartment. (Tr. of Hr'g on Defs.' Mots. to Suppress [Tr.] at 14-15.) However, the affidavit does not contain this information, and the Government indicated that it first became aware of this information at the suppression hearing. (*Id.* at 15.) Therefore, Castro's overnight visits to Rodriguez's apartment may not be considered in evaluating probable cause or good faith. *See Miknevich*, 638 F.3d at 182.

suspected to be in possession of drug paraphernalia or proceeds during his September 6th encounter with Martinez and Almeida-Urias. Based on the dearth of evidence linking the drug conspiracy to Rodriguez's apartment, the Court concludes that no objectively reasonable police officer could believe that the search of Rodriguez's apartment was lawful. *See Zimmerman*, 277 F.3d at 438.

### IV. CONCLUSION

For the foregoing reasons, the Court holds that the warrant to search 3300 Street Road lacks probable cause, and the good faith exception does not apply. Accordingly, the Court GRANTS Defendant's Motion to Suppress Physical Evidence. An Order consistent with this memorandum will be docketed separately.